In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2983

SHANE KERVIN,

*Plaintiff-Appellant,*

*v.*

LA CLAIR BARNES, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:14-cv-00379-JTM-CAN — **James T. Moody**, *Judge.*

SUBMITTED APRIL 14, 2015 — DECIDED MAY 29, 2015

Before POSNER, FLAUM, and ROVNER, *Circuit Judges.*

POSNER, *Circuit Judge.* Shane Kervin, an inmate of an Indiana prison, appeals the dismissal of his suit in which, invoking 42 U.S.C. § 1983, he alleges that prison officials violated his constitutional rights because of his insisting on being allowed to see his lawyer, who had come to the prison to speak with him. He contends that he was placed in segregation as punishment for insisting on keeping his appointment with the lawyer and denied his right to due process of law

when his attempts to seek redress through the prison's grievance system for his wrongful punishment were thwarted by biased grievance officers. The district judge dismissed the suit on the pleadings.

A prison guard forbade Kervin to enter the prison's visitation room to meet with his lawyer. (We've not been told the purpose of the meeting.) The guard relented after some minutes and permitted the meeting, but according to Kervin told him he'd write up a false report and have him placed in segregation. And indeed it appears that Kervin was forced to serve up to 30 days in segregation and temporarily (we do not know for how long) denied telephone and commissary privileges—punishments that he says he was unable to avert because of the hostility to him of the prison's grievance officers.

The district judge gave Kervin two opportunities to amend his complaint in order to clarify his claims, but was dissatisfied with Kervin's response and after screening the complaint pursuant to 28 U.S.C. § 1915A for nonfrivolous claims ruled that Kervin had failed to state a valid claim. The complaint itself alleged that despite the guard's threat to file a false report Kervin had been punished for defying the guard's order by asking to be let out of the day room to meet with his lawyer after being told that he could not leave the room just yet. So either the guard did not file a false report despite his threat to do so or the report was disregarded, for by Kervin's own account it was not the basis of his punishment—his backtalk was. And backtalk by prison inmates to guards, like other speech that violates prison discipline, is not constitutionally protected. *Ustrak v. Fairman*, 781 F.2d 573, 580 (7th Cir. 1986) ("We can imagine few things more

inimical to prison discipline than allowing prisoners to abuse guards and each other. The level of violence in American prisons makes it imperative that the authorities take effective steps to prevent provocation"); see also *Watkins v. Kasper*, 599 F.3d 791, 799 (7th Cir. 2010); *Bridges v. Gilbert*, 557 F.3d 541, 551 (7th Cir. 2009); *Gee v. Pacheco*, 627 F.3d 1178, 1187–88, 1191 (10th Cir. 2010).

Kervin further argues that he was punished not for his insubordinate speech but rather for meeting with, and presumably talking to, his lawyer, which he also claims was protected speech. But we aren't told anything about the lawyer's meeting with Kervin, and so we don't know whether it involved any protected speech.

As for Kervin's due process claim, the judge ruled that neither the loss of privileges was a severe enough sanction, nor his time in segregation long enough, to deprive him of any liberty protected by the due process clause of the Fourteenth Amendment.

The judge further ruled that Kervin's claim against the allegedly hostile grievance officers failed because they had not blocked him from pursuing his grievances in court. The Prison Litigation Reform Act does not require a state to create a grievance procedure for its prison inmates, 42 U.S.C. § 1997e(b), though if it does yet prevents a prisoner from utilizing it he will be excused from having to exhaust the grievance process as a prerequisite to suing in federal court on the ground that the grievance is of federal constitutional magnitude. *Kaba v. Stepp*, 458 F.3d 678, 684–86 (7th Cir. 2006). But the inadequacies of the grievance procedure itself, as distinct from its consequences, cannot form the basis for a constitutional claim. *Bridges v. Gilbert*, *supra*, 557 F.3d at 555;

*Grieveson v. Anderson*, 538 F.3d 763, 772–73 (7th Cir. 2008); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).

The district judge rejected Kervin's complaint about the grievance proceedings not because of Kervin's ability to litigate his grievance, however, but rather because his stints in segregation and denial of telephone and commissary privileges were, the judge decided, neither "atypical" nor "significant," hence not "a dramatic departure from the basic conditions of [the prisoner's] sentence." And so, consistently with *Sandin v. Conner*, 515 U.S. 472, 484–85 (1995), from which we've been quoting, Kervin hadn't been deprived of liberty.

The Supreme Court has noted that "in *Sandin*'s wake the Courts of Appeals have not reached consistent conclusions for identifying the baseline from which to measure what is atypical and significant in any particular prison system. This divergence indicates the difficulty of locating the appropriate baseline." *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) (citations omitted). Compare *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997), which thought disgusting conditions of administrative segregation not to be actionable because they had lasted for "only" six months, with *Hatch v. District of Columbia*, 184 F.3d 846, 858 (D.C. Cir. 1999), holding that 29 weeks (a shade over six months) in administrative segregation could be actionable even though the conditions of segregation, although restrictive, were not unsanitary or otherwise disgusting, *id*. at 854—were not, as alleged in *Beverati*, "infested with vermin," "smeared with human feces and urine," "flooded with water from a leak in the toilet on the floor above," etc. 120 F.3d at 504. *Wilkerson v. Goodwin*, 774 F.3d 845, 853 (5th Cir. 2014), and *Brown v. Oregon Department*

*of Corrections*, 751 F.3d 983, 988 (9th Cir. 2014), sensibly suggest that the severity of treatment should be combined with its duration in assessing the gravity of the conditions complained of by the prisoner. See also *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996). But this need not imply that a rigid six-month period of inhuman confinement is a condition precedent to a deprivation of a prisoner's constitutionally protected liberty.

*Marion v. Radtke*, 641 F.3d 874, 876 (7th Cir. 2011), points out that that "the right comparison is between the ordinary conditions of a high-security prison in the state, and the conditions under which a prisoner is actually held." That doesn't say a great deal, however, because the critical question is how far the treatment of the complaining inmate deviates from those ordinary conditions. And what if the inmate is an elderly person convicted of a nonviolent crime such as bank fraud and serving his prison term in a minimum-security prison; wouldn't it be "atypical" and "significant" for *him* to be sent to a high-security prison for a trivial disciplinary infraction?

*Meachum v. Fano*, 427 U.S. 215 (1976), contains language to the effect that moving a prisoner from a lower-security to a higher-security prison does *not* deprive him of liberty protected by the due process clause. But that was a case in which prisoners were transferred because they were suspected of having committed arson in the lower-security prison. They *had* to be transferred, to protect the inmates and staff of the lower-security prison. It would be a mistake to extrapolate from those facts a rule that allowed a prisoner to seek relief for being placed in solitary confinement in his prison but never for being transferred from a prison in

which he hadn't been in solitary confinement to one in which all prisoners are in solitary (or the common 23-hour approximation thereto), as at ADX, the federal "Supermax" prison in Florence, Colorado.

The judge made two errors in finding that Kervin could not establish a violation of the *Sandin* standard, though they were not consequential. The first was to evaluate separately the gravity of each punishment meted out to him, thereby failing to assess the aggregate punishments inflicted. We said in *Marion v. Columbia Correctional Institution*, 559 F.3d 693, 699 (7th Cir. 2009), that "we must take into consideration all of the circumstances of a prisoner's confinement in order to ascertain whether" he has been deprived of liberty within the meaning of the due process clause. The judge's second error was to suggest, echoing the *Beverati* decision, that a prisoner must spend at least six months in segregation before he can complain about having been deprived of liberty without due process of law. A considerably shorter period of segregation may, depending on the conditions of confinement and on any additional punishments, establish a violation, as held in such cases as *Palmer v. Richards*, 364 F.3d 60, 65–67 (2d Cir. 2004) (77 days); *Mitchell v. Horn*, 318 F.3d 523, 527, 532–33 (3d Cir. 2003) (90 days); and *Gaines v. Stenseng*, 292 F.3d 1222, 1225–26 (10th Cir. 2002) (75 days).

Six months is not an apt presumptive minimum for establishing a violation. Judges who lean toward such a presumption may be unfamiliar with the nature of modern prison segregation and the psychological damage that it can inflict. Segregation isn't just separating a prisoner from one or several other prisoners. As noted by the Supreme Court in the *Wilkinson* case, "almost all human contact is prohibited,

even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room." 545 U.S. at 223–24. The serious psychological consequences of such quasi-solitary imprisonment have been documented. See, e.g., Elizabeth Bennion, "Banning the Bing: Why Extreme Solitary Confinement is Cruel and Far Too Usual Punishment," 90 *Indiana Law Journal* 741 (2015); Stuart Grassian, "Psychiatric Effects of Solitary Confinement," 22 *Washington University Journal of Law & Policy* 325 (2006); Craig Haney & Mona Lynch, "Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement," 23 *N.Y.U. Review of Law & Social Change* 477 (1997).

Kervin, however, was placed in segregation for at most 30 days and, more importantly, does not allege that he suffered any significant psychological or other injury from it. So the judge was right to dismiss his suit. But we take this opportunity to remind both prison officials and judges to be alert for the potentially serious adverse consequences of protracted segregation as punishment for misbehavior in prison, especially the kind of nonviolent misbehavior involved in the present case.

AFFIRMED.